IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LAURESE GLOVER,**                                    Case Number 1:12 CV 267

    Petitioner,                                    Judge Christopher A. Boyko

     v.                                                        REPORT AND RECOMMENDATION

**DON MORGAN[1],** Warden

    Respondent.                                    Magistrate Judge James R. Knepp II

### INTRODUCTION

    Petitioner Laurese Glover, represented by the Ohio Innocence Project, is a prisoner in state custody. Petitioner filed a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent Warden Don Morgan filed a Motion to Dismiss (Doc. 7) with attached exhibits. (Doc. 7-1 thru 10). Petitioner then filed a Response (Doc. 9) followed by Petitioner's Motion to Supplement Petitioner's Response to Respondent's Motion to Dismiss. (Doc. 13). Next, Petitioner moved the Court to hold his Petition in abeyance pending the exhaustion of certain state claims (Doc. 15), which Respondent opposed. (Doc. 17). Finally, Petitioner filed a Motion to Dismiss the Seventh Ground for Relief (Doc. 20) in his Petition. (Doc. 1).

    The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). For the reasons discussed below, the undersigned recommends Respondent's Motion to Dismiss be granted the Petition be denied.

---

1. Don Morgan is the Warden at the Southern Ohio Correctional Facility where Petitioner is currently incarcerated. As such, Morgan is the proper Respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004); (Doc. 6, at 1 n.1).

### FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings were erroneous. 28 U.S.C § 2254(e)(1); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial record. *Mitzel*, 267 F.3d at 530. The Cuyahoga County Court of Appeals, Eighth District of Ohio, set forth the following findings of fact:

> Shortly before 6:00 p.m. on February 10, 1995, nineteen-year old Clifton Hudson was gunned down as he stood on the sidewalk of Strathmore Road in East Cleveland. Later that night, appellant and Derrick Wheat were arrested at Wheat's home for the shooting. Appellant, born on May 19, 1978, was sixteen years and nine months of age. Early the next morning, Eugene Johnson, a companion of appellant and Wheat, also was arrested.

> A complaint was brought in juvenile court alleging appellant was a delinquent child because he unlawfully and purposefully caused the death of Hudson. Juvenile court held a hearing on the matter for all three of the boys. Juvenile court found the evidence presented at the hearing to be sufficient to establish probable cause. Juvenile court found appellant would not be amenable to juvenile treatment or rehabilitation. The motion to transfer jurisdiction of the case to the court of common pleas was granted. Appellant was bound over to be tried as if he were an adult.

> Appellant, Wheat, and Johnson were indicted for aggravated murder with a firearm specification. Trial commenced on January 8, 1996. The three were tried together. Oral statements made to police by the defendants shortly after their arrest were introduced into evidence. Wheat's statement was that on February 10, 1995, at around 5:30 p.m., he was being driven home by appellant in appellant's black Chevy Blazer. Wheat sat in the front passenger's seat while Johnson rode in the back. Appellant drove north on Strathmore Road until he reached a stop sign.

> Wheat observed the victim walking on the sidewalk on Strathmore. The victim was approached by a tall, slender, young male wearing a dark blue jacket. The male pulled out what Wheat believed to be a revolver and shot the victim about five times.

Wheat saw the shooter stand over the victim. Appellant drove to a house on Shaw Avenue and parked in the driveway. Appellant then walked across the street to his girlfriend's house. Wheat and appellant met up later that night and went to Wheat's house where they were arrested.

Appellant stated he, Wheat, and Johnson left appellant's home at 1838 Knowles at approximately 5:00 p.m. The three drove to Strathmore in appellant's black Blazer. Appellant stopped the Blazer at the stop sign at the corner of Strathmore and Manhattan. He observed a tall, slim, black male wearing blue jeans, and a dark hooded sweatshirt under a blue coat walking down Strathmore. Another male was standing near the stop sign. The male in the blue coat tapped the second male on the shoulder. When the second male turned around he began to run. The male in the blue coat shot the victim several times. Appellant turned right on Manhattan, almost striking another vehicle. He drove to Shaw and parked in the driveway of a home there. Appellant walked across Shaw to his girlfriend's house. Appellant left several hours later and returned to his home. He and Wheat were arrested later at Wheat's home.

Johnson stated that about 2:00 p.m., on February 10, 1995, he was at appellant's house with appellant and Wheat. The three talked and smoked marijuana. They left around 5:30 p.m. in appellant's black Chevy Blazer. Wheat sat in the front passenger seat while Johnson sat in the back. When stopped at Strathmore and Manhattan, Johnson observed the victim walking down Strathmore toward Manhattan. The victim was approached from behind by a young, tall, slender male wearing a dark brown jacket. This male had a gun and appeared to be robbing the victim. Johnson heard about six gunshots as he observed the suspect stand over the victim. Appellant turned right onto Manhattan and dropped Johnson off at his home.

Tamika Harris, age fifteen years old at the time of trial, testified that on February 10, 1995, at about 5:45 p.m., she was walking home on Strathmore in the company of her friend, Monique. Harris heard two gunshots but did not see from where the gunshots were fired. Monique turned and ran back toward her home. Harris observed a black four-by-four vehicle stopped in the street. Harris saw a male in the street, coming from around the vehicle. The male stood in the street and fired five more shots at Hudson who was on the sidewalk. The black four-by-four was stationary on Strathmore while the shooting took place. After the last shot was fired, the vehicle made a right turn onto Manhattan, swerving around another car to avoid hitting it. The shooter passed by Harris' position as he ran after the black Blazer. The vehicle slowed down as the shooter ran after it. Harris saw the face of the male as he ran past her. Harris had observed two black people in the front seat of the Blazer.

Harris talked to the police at the scene and made a statement that day at the police station. In her statement, Harris said she saw a guy get out of a black, four-by-four with tinted windows and pull a gun from his pants. At trial, Harris testified she did

3

not observe a male get out of the black vehicle and did not see from where the gun came. Harris testified she assumed the male came from the Blazer. In the statement, Harris said she did not see the face of the shooter that clearly and could not identify him. She also stated the suspect was 5'7" in height or taller with a medium complexion. The perpetrator was wearing a red and blue Tommy Hilfiger coat, a black skullcap and black pants.

Harris returned to the police station the next day and was shown pictures of the three defendants. Harris identified Johnson's picture without hesitation as being that of the shooter. She also identified a maroon, blue, and green Nautica coat and black hooded sweatshirt as the clothing worn by the suspect. The clothing belonged to Johnson. Harris testified that Nautica and Tommy Hilfiger coats are very similar. Harris was shown appellant's vehicle, a GMC Jimmy, which she identified as the one she observed at the scene of Hudson's murder.

The police tested the hands and clothing of all three defendants for gunshot residue. The results from both of Wheat's hands were consistent with gunshot residue. The test indicates whether a person has either recently fired a gun or has been in close proximity of a gun discharged. If a significant reaction for antimony and barium is found, the quantity of both indicates the source was a gunshot. Neither appellant's nor Johnson's hands tested positive for gunshot residue.

Two nitrite particles were found in the back left sleeve of Wheat's Indians jacket. Both appellant's jacket and that of Johnson tested negative for blood and nitrite particles. Gloves found in the pocket of Johnson's jacket also were tested. Antimony and barium consistent with gunshot residue were found on the palm of the left glove. The palm of the right glove yielded an inconclusive reaction.

Appellant's vehicle was tested for the presence of lead residue and nitrites. The presence of lead was detected on the bottom of the front passenger's seat, the armrest on the passenger's side door, and on the exterior of the passenger's side door below the window. The residue was consistent with a firearm having been discharged.

After the prosecution rested, the defense made a *Crim.R. 29* motion. The trial court found insufficient evidence to establish prior calculation and design. The charge of aggravated murder was dismissed. The trial court found sufficient evidence to proceed on the murder charge.

Leroy Malone testified for the defense that on February 10, 1995, he was parking his truck on Ardenall Avenue, which is the next street over from Strathmore. Malone heard two shots fired followed by three additional shots. A black Ford Bronco drove out from under the bridge and onto Ardenall. Another man was running on foot behind the Bronco. That man put something in his pants just before he got to Ardenall. The man then ran down to the railroad tracks toward Shaw. Malone was

4

familiar with all three defendants as they lived in the neighborhood. Malone testified the person he saw running behind the black truck was not any of the defendants.

Eric Reed testified he lived on Strathmore at the time of the murder. Reed heard a few shots fired and looked out his window. He saw one man holding a gun, standing over another male who was lying on the sidewalk. The man holding the gun was described as being about 5'11" in height with a light complexion. He was wearing a dark jacket and a hooded sweatshirt.

The jury found appellant guilty of murder and not guilty of the gun specification. Appellant received a sentence of fifteen years to life.

(Doc. 7-1, Ex. 6).

## STATE COURT CONVICTION

On June 13, 1995, a Cuyahoga County Grand Jury issued an indictment charging Petitioner and co-defendants Derrick Wheat ("Wheat") and Eugene Johnson ("Johnson") with one count of Aggravated Murder each, pursuant to Ohio Revised Code § 2903.01, including a firearm specification. (Doc. 7-1, Ex. 1) (Case No. CR95-324431). The charges arose from the shooting of Clifton Hudson. All three defendants entered pleas of not guilty to the indictment and a joint trial commenced on January 8, 1996. At the close of the State's case, all three defendants moved for acquittal pursuant to Ohio Crim.R. 29. The trial court found insufficient evidence to establish prior calculation and design, and amended the indictment to the lesser charge of Murder, defined in Ohio Revised Code § 2903.02, with respect to each defendant. (Doc. 7-5, P. 1070-71). Upon conclusion of their case, defense counsel renewed their Ohio Crim.R. 29 motions, which the court denied. (Doc. 7-5, P. 1169). On January 18, 1996, the jury found Petitioner guilty of murder, but not guilty of the accompanying the firearm specifications. Both Johnson and Wheat were convicted of murder, with the firearm specification. On January 22, 1996, the court sentenced Petitioner to a term of fifteen years to life imprisonment. (Doc. 7-1, Ex. 2).

## DIRECT APPEAL

Represented by different counsel, Petitioner filed a timely notice of appeal to the Eighth

District Court of Appeals, Cuyahoga County. (Doc 7-1, Ex. 3). In his brief, Petitioner asserted the

following assignments of error:

1.   Mr. Glover's due process rights under Article I, Section 16 of the Ohio
     Constitution and the Fourteenth Amendment to the United States
     Constitution were violated as his conviction was not supported by
     sufficient evidence.

2.   The verdict is against the manifest weight of the evidence when there is no
     substantial evidence upon which a trier of fact could reasonably conclude
     that the elements of the offenses had been proven beyond a reasonable
     doubt.

3.   The trial court erred by denying Laurese Glover's Criminal Rule 29
     motion for acquittal where the evidence was insufficient to support a
     conviction, thereby violating Defendant's constitutional rights under the
     Fourteenth Amendment and Section 16, Article I of the Ohio Constitution.

4.   The trial court erred by depriving Laurese Glover of due process of law,
     thereby violating Defendant's constitutional rights under the Fifth and
     Fourteenth Amendments and Section 10, Article I of the Ohio
     Constitution.

5.   Laurese Glover was denied effective assistance of counsel in violation of
     the Sixth and Fourteenth Amendments to the United States Constitution
     and Article I, Section 10 of the Ohio Constitution, when his counsel failed
     to object to the private meeting conducted between the trial court and the
     jury during the course of its deliberations.

6.   The juvenile court erred by binding over Laurese Glover to the trial court
     to stand trial as an adult.

(Doc. 7-1, Ex. 8). The State filed a brief in response. (Doc. 7-1, Ex. 5). On January 16, 1997, the

Court of Appeals affirmed the judgment of the trial court. (Doc. 7-1, Ex. 6). Petitioner did not

pursue an appeal to the Ohio Supreme Court.

6

## JOHNSON'S POST CONVICTION PROCEEDINGS

In the meantime, co-defendant Johnson appealed his conviction and sentence and raised the following three assignments of error:

1.   The trial court erred in admitting evidence regarding eyewitness identification where the photographic identification procedure was impermissibly suggestive and unreliable.

2.   The trial court erred in not declaring a mistrial where prosecutorial misconduct occurred as a result of prosecutor's statements during voir dire, opening statements and trial that Defendant was a member of a gang and no evidence was presented on this issue.

3.   The trial court erred in not declaring a mistrial where there was substantial evidence that improper third party communications with jurors resulted in jurors' concern about personal safety and intimidation, which prejudiced Defendant's right to be tried by a fair and impartial jury.

(Doc. 7-1, Ex. 7).

On January 27, 1997, the Court of Appeals affirmed the judgment of the trial court. (Doc. 7-1, Ex. 7). Johnson did not file a timely appeal to the Ohio Supreme Court and on May 14, 1997, his motion for leave to file a delayed appeal was denied. (Doc. 7-1, Ex. 8).

On January 23, 2004, Johnson filed a motion for leave to file a motion for a new trial, and a motion for a new trial in the Cuyahoga County Court of Common Pleas. Johnson claimed to have newly discovered evidence that he was previously unavoidably prevented from obtaining. (Doc. 7-1, Ex. 9). On January 29, 2004, the court granted leave to file the motion for a new trial. On February 25, 2004, however, the court struck the motion for a new trial as Johnson failed to file his new evidence within seven days of the order. (Doc. 7-1, Ex. 10). On March 16, 2004, Johnson filed a motion for an evidentiary hearing based on newly discovered evidence and attached an affidavit from  Tamika Harris recanting her previous testimony. In the affidavit, Ms. Harris stated she

identified Johnson in a photo array because he was wearing a jacket similar to the one worn by the shooter as he ran past her on the date of the incident. (Doc. 7-1, Ex. 11). The court held a hearing to determine if Johnson had been unavoidably prevented from discovering the new evidence and ordered the parties to submit briefs. (Doc. 7-1, Ex. 12). On June 18, 2004, Johnson submitted a post hearing brief. (Doc. 7-1, Ex. 13). On July 22, 2004, the court found Johnson was unavoidably prevented from timely filing his motion for a new trial. (Doc. 7-1, Ex. 14). On July 27, 2004, Johnson filed his motion for a new trial and attached excerpts from the transcript he deemed relevant. (Doc. 7-1, Ex. 15). The State filed a response to the motion for a new trial. (Doc. 7-1, Ex. 16). On September 17, 2004, the court granted Johnson a new trial. (Doc. 7-1, Ex. 17).

On October 18, 2004, the State appealed from the entries granting Johnson a new trial for Case No. CA04085416. In its brief, the State presented the following assignments of error:

    1.    The Common Pleas Court erred in finding that defendant was unavoidably prevented from timely filing his motion for new trial. (Journal Entry dated July 22, 2004).

    2.    The trial court erred in granting Johnson's motion for new trial. (Journal Entry dated September 17, 2004).

(Doc. 7-1, Ex. 18). The State argued the "new evidence" had been presented to the jury at the trial, referring to the relevant portions of the transcript. On May 6, 2005, Johnson filed a brief disputing the details of the testimony presented at trial and the significance thereof in context. (Doc. 7-1, Ex. 19). On August 4, 2005, the Court of Appeals issued a journal entry and opinion concluding the judgment of the trial court was not reasonable and the trial court abused its discretion by granting a new trial, thereby reversing the trial court's judgment. The Court of Appeals found  the contradictions in Harris's testimony had been presented and argued at trial. (Doc. 7-1, Ex. 20). Johnson filed a motion for reconsideration, which the court denied on August 4, 2005. (Doc. 7-1,

8

Ex. 21-22).

Johnson timely appealed to the Ohio Supreme Court on September 19, 2005 and presented the following propositions of law:

1.   A trial court's determination that a criminal defendant's delay in filing a motion for new trial based upon newly discovered evidence, was reasonable under the circumstances and should not be disturbed on appeal absent a clear abuse of discretion on the part of the trial court.

2.   A trial court's conclusion that a criminal defendant has presented newly discovered evidence justifying a new trial is not unreasonable or arbitrary and should not be disturbed on appeal if supported by competent and credible evidence.

(Doc.7-1, Ex. 23). The State did not respond. On January 25, 2006, the Ohio Supreme Court declined jurisdiction and dismissed the case. (Doc. 7-1, Ex 24). Johnson's motion for reconsideration was denied on March 29, 2006. (Doc. 7-1, Ex. 25-26).

## PETITIONER'S FIRST MOTION FOR NEW TRIAL

On November 22, 2004, Petitioner and Wheat filed a joint motion for leave to file motion for a new trial based on the same "newly discovered evidence" Johnson alleged in his motion for a new trial (Doc. 7-1, Ex. 9) – that Tamika Harris had recanted her testimony identifying Johnson as the shooter. (Doc. 7-1, Ex. 27) The State filed a response in opposition. (Doc. 7-1, Ex. 28). On April 19, 2005, Petitioner's motion for leave to file a motion for a new trial was denied due to res judicata. (Doc. 7-1, Ex. 29). On May 6, 2005, the trial court granted Petitioner leave to file a motion for a new trial. (Doc. 7-1, Ex. 30). Petitioner filed his motion for a new trial on May 12, 2005. (Doc. 7-1, Ex. 31). The State filed a response requesting dismissal of the motion for a new trial. (Doc. 7-1, Ex. 32). On July 28, 2005, the court denied the motion without explanation. (Doc. 7-1, Ex. 33). Petitioner did not appeal this decision.

9

## JOHNSON'S FEDERAL HABEAS CORPUS PROCEEDINGS

On November 21, 2006, Johnson, through counsel, filed a federal habeas corpus petition and asserted the following grounds for relief:

> **Ground One**: The Eighth District Court of Appeals deprived petitioner of his due process rights by erroneously holding that the trial court abused its discretion in granting petitioner's motion for leave to file a motion for a new trial.

> **Ground Two**: The Eighth District Court of Appeals deprived petitioner of his due process rights by erroneously holding that the trial court abused its discretion in granting petitioner's motion for a new trial.

(Doc. 7-1, Ex. 34). The State filed a response arguing Johnson's claims were barred by the statute of limitations and procedurally defaulted. (Doc. 7-1, Ex. 35). Johnson filed a traverse on May 14, 2007. (Doc. 7-1, Ex. 36). On May 20, 2008, a report and recommendation was issued. (Doc. 7-1, Ex. 37; *Johnson v. Gansheimer*, 2008 U.S. Dist. LEXIS 123230 (N.D. Ohio 2008). The Magistrate Judge found Johnson's petition was time-barred, but he was entitled to equitable tolling based on "newly discovered evidence" – Tamika Harris's alleged recantation and new gunshot testing procedures – which created a credible claim of actual innocence. The evidence before the court was 1) Tamika Harris' communication with Johnson's mother that she recanted her identification of Johnson as the shooter; and 2) an electronic message Tamika Harris sent to Johnson through the Innocent Inmates website. *Johnson v. Gansheimer*, 2008 U.S. Dist. LEXIS 123230, at *23 (N.D. Ohio 2008). The District Court then recommended Johnson's request for an evidentiary hearing be granted. (Doc. 7-1, Ex. 37); *Johnson*, 2008 U.S. Dist. LEXIS 123230, at *31-35 (N.D. Ohio 2008). Over objections, the report and recommendation was adopted on July 11, 2008. (Doc. 7-1, Ex. 38).

Prior to the evidentiary hearing, the State filed a motion in limine to prohibit introduction of Johnson's expert document or testimony at the hearing – specifically, a report on gunshot residue

10

prepared by Johnson's expert, John W. Kilty, a forensic science consultant. The State argued the report should have first been presented to the state courts in a post-conviction action. (Doc. 7-1, Ex. 39). The State also filed a motion to clarify the scope of the evidentiary hearing to prohibit a freestanding claim of actual innocence. (Doc. 7-1, Ex. 40). On October 6, 2008, the District Court denied the State's motion in limine, but granted the motion to clarify. (Doc. 7-1, Ex. 43). On October 3, 2008, the State filed a motion for summary judgment. (Doc. 7-1, Ex. 44). Johnson filed a response, to which the State filed a reply. (Doc. 7-1, Ex. 45-46). The evidentiary hearing was held on October 22, 2008. Thereafter, Johnson filed a post-hearing brief and the State filed a brief in response. (Doc. 7-1, Ex. 47-48).

On August 3, 2009, the Magistrate Judge issued a report and recommendation recommending the State's motion for summary judgment be granted and Johnson's petition for a writ of habeas corpus be denied. (Doc. 7-1, Ex. 49). The report and recommendation was adopted on September 21, 2009. (Doc. 7-1, Ex. 50). Johnson did not pursue an appeal of this decision.

## PETITIONER'S SECOND MOTION FOR A NEW TRIAL

On January 12, 2009, Petitioner, now represented by the Ohio Innocence Project from the University of Cincinnati College of Law, filed a second motion for leave to file a motion for a new trial. (Doc. 7-1, Ex. 51). Petitioner alleged newly discovered evidence established his conviction was based on unreliable gunshot residue testing. On February 13, 2009, the State filed a consolidated brief in opposition to Petitioner's motion for leave and to an identical but separately-filed motion by Wheat[2], as well as a separate motion filed by Johnson, raising similar issues. (Doc. 7-1, Ex. 52). The trial court granted the motion for leave on February 26, 2009. (Doc. 7-1, Ex. 53). Petitioner filed

_____

2. Wheat was also represented by the Ohio Innocence Project.

11

his motion for new trial on March 12, 2009. (Doc. 7-1, Ex. 54). On March 30, 2009, the State filed

a consolidated brief opposing the motion for a new trial (Doc. 7-1, Ex. 55), and a motion in limine

to exclude evidence and argument from prior motions for new trial. (Doc. 7-1, Ex. 56). Petitioner

(and Wheat) filed a response in opposition to the motion in limine. (Doc. 7-1, Ex. 57). On April 16,

2009, the parties filed a joint stipulation that the testimony and report of forensic expert John Kilty,

from Johnson's federal habeas corpus action, were to be included as part of the record in this case.

(Doc. 7-1, Ex. 58). On April 16, 2009, the trial court held a joint hearing with all three defendants

on the motion for a new trial. Petitioner subsequently filed a post-hearing brief and the State filed

a joint response brief. (Doc. 7-1, Ex. 59-60). On June 23, 2009, the trial court denied Petitioner's

motion for a new trial without findings or an opinion. (Doc. 7-1, Ex. 61).

Petitioner timely appealed the denial of his motion for a new trial to the Eighth District Court

of Appeals under Case No. CA09-093623. (Doc. 7-1, Ex. 62). Johnson and Wheat filed separate

appeals. In his brief, Petitioner raised the following assignment of error:

1.      The trial court abused its discretion in denying Glover's motion for a new
        trial based on newly discovered evidence pursuant to Ohio Criminal Rule
        33(A)(6).

        A.      The jury would have reached a different verdict with the benefit of
                the newly discovered evidence.

        B.      The new evidence could not have been discovered with reasonable
                diligence before trial because it did not exist at the time of trial.

        C.      The new forensic evidence is material, is not merely cumulative of
                former evidence and does not merely impeach or contradict former
                evidence.

        D.      Confidence in the outcome of the trial must be viewed relative to
                the evidence as it exists today.

(Doc. 7-2, Ex. 63). The State filed a brief in response (Doc. 7-2, Ex. 64), to which Petitioner filed a

reply. (Doc. 7-2, Ex. 65). On September 2, 2010, the Eighth District Court of Appeal affirmed the

judgment of the trial court in Petitioner's case (Doc. 7-2, Ex. 66), as well as in the appellate cases of

Wheat (Doc. 7-2, Ex. 67) and Johnson (Doc. 7-2, Ex. 68).

 Petitioner, through counsel, filed a timely notice of appeal to the Ohio Supreme Court. (Doc.

7-2, Ex. 69) (Case No. 10-1786). In his memorandum in support of jurisdiction, Petitioner asserted

the following propositions of law:

  I. A significant, undisputed sea change in scientific testing and analysis can
   constitute newly discovered evidence for purposes of a motion for new
   trial pursuant to Rule 33(A)(6) of the Ohio Rules of Criminal Procedure.

  II. Where newly discovered evidence demonstrates that scientific evidence
   used at the underlying trial is unreliable and no longer admissible, the trial
   court shall order a new trial if the absence of the now-unreliable scientific
   evidence would have resulted in a different outcome.

(Doc. 7-2, Ex. 70). The State filed a memorandum in response. (Doc. 7-2, Ex. 71). On February 2,

2011, the Ohio Supreme Court declined jurisdiction to hear the case. (Doc. 7-2, Ex. 72).

## FEDERAL HABEAS CORPUS

 Petitioner, through counsel, filed the instant federal habeas petition on February 2, 2012 and

raised the following grounds for relief:

 **Ground One**: Laurese Glover is actually innocent of Clifton Hudson's murder. His
 conviction violates the U.S. Constitution.

 **Ground Two**: The new evidence presented is so compelling that it would be a
 violation of fundamental fairness embodied in the Due Process Clause of the U.S.
 Constitution not to afford Laurese Glover a new trial where new evidence would be
 considered.

 **Ground Three**: Laurese Glover's conviction was based on a pretrial identification

13

procedure that was so "impermissibly suggestive as to give rise to the likelihood of irreparable misidentification" in violation of Glover's Due Process rights in violation of the U.S. Constitution. The pretrial identification procedure rendered the in court identification unusable-the subsequent use of the in court identification was in violation of Glover's due process rights in violation of the U.S. Constitution.

**Ground Four**: Laurese Glover's Due Process Rights embodied in the U.S. Constitution were violated when the State failed to disclose to Petitioner's trial that they had the suspects in custody and asked her which one was the shooter, (2) the police officer administering the line-up pointed at Eugene Johnson, and (3) police "confirmed" to Ms. Harris that the identification was "correct" by informing her that "the other two" had "gunpowder" on them.

**Ground Five**: Laurese Glover's conviction was based on a pretrial identification procedure that was so "impermissibly suggestive as to give rise to the likelihood of irreparable misidentification" in violation of Glover's due process rights. The evidence not disclosed, listed in Petitioner's Fourth Ground for Relief, rendered the pretrial identification so impermissibly suggestive that it is clear that a misidentification took place in violation of Glover's Due Process Rights in the U.S. Constitution, U.S. Const. Amend. V and XIV.

**Ground Six**: Laurese Glover's Due Process rights under *Brady v. Maryland* were violated when the three pieces of evidence listed out in Petitioner's Third Ground for Relief were not disclosed to trial counsel as they were impeachment material of the State's sole eyewitness.

**Ground Seven**: The Eighth District Court of Appeals overturned the trial court's granting of a new trial for Eugene Johnson, which was granted, in part, based on Tamika Harris's testimony regarding the suggestiveness of the line-up procedure. The Eighth District Court of Appeals, in its reversal, failed to consider Tamika Harris's post-conviction testimony, and simply relied on the original opinion in the direct appeal of Eugene Johnson. *State v. Johnson*, 1997 Ohio App. LEXIS 100 (Ohio Ct. App., Cuyahoga County Jan. 16, 1997). The trial court denied Petitioner's Motion for New Trial based on the Eighth District Court of Appeals reversal of the trial court in *State v. Johnson*, 2005 Ohio 3724 (Ohio Ct. App., Cuyahoga County July 21, 2005). Petitioner was denied Due Process when the Eighth District Court of Appeals failed to consider the three pieces of evidence, not disclosed to Petitioner's trial counsel, listed in Petitioner's Third Ground for Relief and wholly failed to reevaluate the line-up procedures in light of this evidence.

**Ground Eight**: Laurese Glover's trial counsel rendered unconstitutionally deficient representation during pre-trial and trial phases of Petitioner's trial when they (1)

14

failed to request a suppression hearing to suppress an unconstitutional line-up procedure, and (2) failed to object to a private meeting with a juror and failed to conduct voir dire of the juror when that juror raised safety concerns when either Glover, Johnson, or Wheat (the Juror couldn't tell which one it was) said "hi" to the juror in the cafeteria at lunchtime.

**Ground Nine**: The State committed prosecutorial misconduct during voir dire, and opening and closing arguments, when the State discussed "gang activity" of the defendants but failed to present any evidence, and engaged in unconstitutional burden shifting when the State commented on the Petitioner's failure to call an expert on gunshot residue.

**Ground Ten**: Glover was deprived of a fair trial and due process rights when a juror who feared for their personal safety when an unidentifiable defendant said hi in the cafeteria, was permitted to deliberate on Petitioner's jury.

**Ground Eleven**: The cumulative constitutional error in Grounds for Relief 1-10 deprived Glover of a fair trial in violation of due process.

(Doc. 1).

## JURISDICTIONAL ISSUES

In determining whether to issue a habeas writ, the standards set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA) govern the district court's review of a state court decision. *French v. Jones*, 332 430, 435-36 (6th Cir. 2003), *cert. denied*, 540 U.S. 1018 (2003); 28 U.S.C. § 2254. Before a reviewing court may decide a habeas writ on the merits, a petitioner must overcome the one-year statute of limitations promulgated by AEDPA. *Allen v. Yukins*, 366 F.3d 396, 399 (6th Cir. 2004), *cert. denied*, 543 U.S. 865 (2004). Under the doctrine of equitable tolling, this Court has the authority to excuse late-filed habeas claims in limited circumstances. *McSwain v. Davis*, 287 Fed. Appx. 450, 456 (6th Cir. 2008) (quoting *Solomon v. United States*, 467 F. 3d 928, 933 (6th Cir. 2006) (The Sixth Circuit "repeatedly caution[s] that equitable tolling should be granted 'sparingly'"). While the initial burden of raising the statute of limitations defense is on the state, the

15

burden of proof is on the habeas petitioner to persuade the court he is entitled to equitable tolling. *McSwain*, 287 Fed. Appx. at 456.

One form of equitable tolling recognized by the Sixth Circuit is the claim of "actual innocence". *Souter v. Jones*, 395 F.3d 577, 588-89 (6th Cir. 2005). In determining whether a petitioner has met the requirements for establishing a cognizable claim of actual innocence for purposes of equitable tolling, the Sixth Circuit applies the actual innocence standard developed in *Schlup v. Delo*, 513 U.S. 298 (1995). *Souter*, 395 F.3d at 588-89. The standard requires the district court to make a probablistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the standard unless he persuades the district court that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Mc.Cray v. Vasbinder*, 499 F.3d 568, 571-72 (6th Cir. 2007) (quotations omitted); *see also Souter,* 395 F.3d at 602.

> This standard does not require absolute certainty about the petitioner's guilt or innocence: A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty, beyond a reasonable doubt – or, to remove the double negative, that more likely than not any juror would have reasonable doubt.

*McSwain*, 287 Fed. Appx at 458-59.

"The *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327). The petitioner must present *new evidence* of innocence that is so strong a reviewing court cannot have confidence in the outcome of the trial. *Schlup*, 513 U.S. at 327. New evidence may be "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id*. at 324. Actual innocence does not mean actual innocence in the practical sense of the

16

term; rather, actual innocence, if proven, is a "gateway" that allows courts to reach the merits of other claims that would otherwise be time-barred or defaulted. *Schlup*, 513 U.S. at 316.

DISCUSSION

The parties do not dispute Petitioner's claim is time-barred; rather, the parties dispute whether Petitioner can surmount the actual innocence threshold. At the outset, Petitioner argues he is entitled to an actual innocence finding because another district court found Johnson met the actual innocence standard. Regardless, Petitioner argues he has a credible claim of actual innocence based upon the following "new evidence": 1) Tamika Harris's recantation; and 2) new gunshot testing procedures that invalidate the old gunshot testing procedure. For the following reasons, Petitioner's assertions are not well-taken.

### Johnson's Actual Innocence

As noted above, a district court found co-defendant Johnson met the actual innocence standard, but later denied Johnson's writ for habeas corpus on the merits. *See Johnson v. Gansheimer*, 2008 U.S. Dist. LEXIS 123230 (N.D. Ohio 2008); *Johnson v. Gansheimer*, 2009 U.S. Dist. LEXIS 87690 (N.D. Ohio 2009). Petitioner demands a finding of actual innocence because he and Johnson's convictions are "inextricably linked" and finding otherwise would be "preposterous". (Doc. 9, at 1). The undersigned disagrees. While the parties in this case are certainly linked, each played different roles, with different pieces of evidence linking them to the crime. For instance, Tamika Harris's alleged "recantation" centers on her identification of Johnson. All testimony and evidence relating to Petitioner remains the same.

In addition, this Court has testimony and evidence that was not before the federal court when it made its decision concerning Johnson's actual innocence. Namely, Tamika Harris and John Kilty's

17

testimony at Jonnson's federal evidentiary hearing and new post-conviction hearing decisions. Importantly, res judicata does not apply here and there is no "actual innocence by proxy" rule governing co-defendants. Therefore, this Court is not bound by another court's finding regarding Johnson's actual innocence as applied to Petitioner.

***Tamika Harris's Recantation***

On January 12, 1996, Ms. Harris testified at the trial for Mr. Hudson's murder, after which Petitioner, Johnson, and Wheat were convicted. (Doc. 8-7, Tr. 237-362). Ms. Harris testified she saw a man come from behind a black 4 x 4. (Doc. 8-7, Tr. 274-75). Ms. Harris said she "sort of saw a gun" and saw a "boy shooting another boy" – the same man who came from behind the black 4 x 4. (Doc. 8-7, Tr. 237-362). After the shooting, the black 4 x 4 drove towards her. (Doc. 8-7, Tr. 248-51). At the same time, the shooter ran towards her following the black 4 x4. (Doc. 8-7, Tr. 248-51). The black 4 x 4 slowed down, the shooter went behind the vehicle, and was not seen after the vehicle drove away. (Doc. 8-7, Tr. 248-51). It is undisputed Petitioner was the driver of the black 4 x 4. When asked if she saw the shooter's face, Ms. Harris said, "enough to identify him." (Doc. 8-7, Tr. 256). She then testified the shooter was wearing a black hoodie under a maroon, blue, and green Nautica coat – the same clothing Johnson was photographed in after his arrest. (Doc. 8-7, Tr. 256-57, 263-66). Ms. Harris subsequently identified Johnson in the same photograph. (Doc. 8-7, Tr. 256-57, 263-66).

Ms. Harris was cross-examined at length about her identification of Johnson. (Doc. 8-7, Tr. 268). On cross, Ms. Harris testified she did not see the shooter's face that well. (Doc. 8-7, Tr. 280). She also admitted she made a statement to police that she saw the shooter get in the black 4 x 4, even though she testified she did not see him get into the vehicle. (Doc. 8-7, Tr. 282-83).

18

On October 22, 2008, Ms. Harris testified at an evidentiary hearing for Johnson's federal habeas case. (Doc. 8-13, Tr. 81-100). Her testimony at this hearing best summarizes the events surrounding her "recanting" after the murder trial.

In 1998, Mr. Avery, an advocate on behalf of the Johnson family, contacted Ms. Harris and asked if she would give another statement about what she saw the night of the murder. (Doc. 8-13, Tr. 95-96). Mr. Avery asked Ms. Harris if he could bring Johnson's mother. Ms. Johnson attended the interview and met Ms. Harris. (Doc. 8-13, Tr. 96). Ms. Harris told Mr. Avery her testimony had not changed since trial. (Doc. 8-13, Tr. 96).

In 2000, Ms. Harris expressed misgivings about her trial testimony to her mother – specifically, her identification being based on Johnson's clothing. (Doc. 8-13, Tr. 87-88). Ms. Harris testified she was reading Cleveland Scene Magazine in late 2000 and came across an article about a website called Innocent Inmates. (Doc. 8-13, Tr. 87). Ms. Harris went on the website, "not thinking of the case exactly" when Petitioner, Johnson, and Glover's pictures came up describing their convictions in Mr. Hudson's murder. (Doc. 8-13, Tr. 83). At this time, Ms. Harris testified she emailed the website, thinking she was contacting Johnson directly, stating she "may have been wrong in the statement [she] made and when [she] testified at trial." (Doc. 8-13, Tr. 87-88).

When asked why she was not in a position anymore to say the shooter was Johnson, Ms. Harris stated, "Because when I made the identification, it was based solely off of the fact that there was only three people [in the photo lineup] [], and [] one person had on exactly what I described to the police officers [at] the scene as to what [I said] the suspect had on." (Doc. 8-13, Tr. 91).

Ms. Harris testified that in 2003 she met with and provided an affidavit regarding her trial testimony and identification of Johnson to Rod Kee, operator of Innocent Inmates. (Doc. 8-13, Tr.

19

93). Ms. Harris testified she provided a similar affidavit in 2004. (Doc. 8-13, Tr. 93).

Relating back to the night of murder, Ms. Harris stated she heard two gunshots and a pause (Doc. 8-13, Tr. 83).  A man came from behind a Bronco, the Bronco continued to drive by the man, then Ms. Harris saw this man fatally shoot Mr. Hudson (Doc. 8-13, Tr. 83). The shooter then went back toward the Bronco. (Doc. 8-13, Tr. 84). Ms. Harris went to the police station, was shown photographs of three individuals, and identified Johnson as the shooter based on his clothing – a black hoodie and maroon and green down coat, either Nautica or Tommy Hilfiger. (Doc. 8-13, Tr. 85).  Concerning her identification of Johnson as the shooter, Ms. Harris was not sure if  she said to police at the time "yes, this is him", but she was sure she said her identification was based on his clothing. (Doc. 8-13, Tr. 85).

Recanting witnesses are viewed with extreme suspicion.  *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007). Recantation "upsets society's interest in finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (citing *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984)).

Ms. Harris's recantation centers on doubts concerning her facial identification of Johnson; however, she was cross-examined and impeached regarding her facial identification of Johnson. Further, while Ms. Harris's assessment of her identification has changed, the underlying rationale of her testimony has remained the same – that she never got a clear look at Johnson's face on the night of the shooting, and her identification was based on Johnson's clothing. At best, Ms. Harris's "recantation" shows her doubt as to whether she saw Johnson's face, which she was questioned about on cross-examination.

The undersigned must view recanting statements with extreme suspicion. Indeed, the time line leading to Ms. Harris's "recanting" gives reason to pause. In 1998, Johnson's defense team asked to speak with Ms. Harris in the presence of Johnson's mother, a presumably uncomfortable situation for anyone, let alone an adolescent. After this meeting, Ms. Harris expressed misgivings to her own mother about identifying Johnson.  In 2000, Ms. Harris came across a website, notably titled "Innocent Inmates", discussing the case she testified in, which proclaimed Petitioner, Johnson, and Glover were innocent. After reading the Innocent Inmates story, Ms. Harris publicly called her facial identification of Johnson into question and reached out to Johnson about her testimony. The time line indicates Ms. Harris remained steadfast in her testimony until she was called into question by Johnson's defense team in the presence of his mother, and a website proclaiming she got it wrong.

Importantly, Ms. Harris's only doubt concerning her testimony was her facial identification of Johnson. Her testimony relating to Petitioner's role remains the same. Namely, that Ms. Harris identified a black 4 x 4 vehicle; Petitioner was the driver of the black 4 x 4; the vehicle was at the scene of the shooting; Ms. Harris heard two gunshots followed by a pause; the shooter came from behind Petitioner's vehicle, fatally shot Mr. Hudson, then disappeared behind his vehicle after he slowed down next to the shooter. Later, Petitioner's vehicle was tested and contained lead particles consistent with gunshot residue.  No one has disputed this portion of the testimony ostensibly linking Petitioner to the crime.

Therefore, regardless of whether Ms. Harris's testimony is considered new – and the undersigned does not believe it is – Petitioner fails to persuade the Court, based on Ms. Harris's "recantation", a reasonable juror would have had reasonable doubt as to Johnson or Petitioner's guilt

21

thus finding them not guilty.

***Gunshot Testing***

Petitioner also argues the gunshot residue test performed on him and his co-defendants was unreliable. Petitioner's basis for this argument is that a more accurate test has been developed and accepted by government agencies to detect gunshot residue since Petitioner's trial. The parties briefed the Court substantially about gunshot residue testing and particle fusion, and provided evidence regarding contamination probability. However, one simple fact remains: Petitioner attacks the validity of the test itself, not its application, and while the original testing may be outdated, it was not unreliable.

At trial, Dr. Rosenberg, a forensic scientist with Cuyahoga County's Coroner's Office testified as an expert witness concerning the gunshot residue ("GSR"). (Doc. 8-7). Dr. Rosenberg obtained samples collected from the hands and clothes of Petitioner and his co-defendants. The test she used, known as Atomic Absorption Spectrometry ("AAS"), could trace particles consistent with GSR for someone who fired a gun, or was nearby a gun being discharged in close proximity. (Doc. 8-7). Dr. Rosenberg not only looked for GSR particles, but high quantities of GSR particles in one area. (Doc. 8-7). She testified there was no indication the samples taken were contaminated, and determined Wheat's hands and the gloves found in Johnson's jacket showed evidence of GSR. (Doc. 8-7). On cross, Dr. Rosenberg acknowledged other materials contain the same particles as GSR, but reiterated the particle quantity was high enough to be consistent with GSR. (Doc. 8-7).

Mr. Turbok, a forensic firearm examiner, testified the passenger side of Petitioner's vehicle contained lead residue consistent with particles in GSR. (Doc. 8-7). Petitioner was the driver of the vehicle at the time of the murder.

Petitioner argues an FBI Symposium Report supports his contention that his co-defendants tested positive for GSR because the AAS test did not account for the possibility that they were exposed to GSR in a police vehicle or at the police station. Notably, Petitioner was arrested with Wheat and taken to the same police station, but did not test positive for GSR. Further, Petitioner argues John Kilty's testimony at Johnson's federal evidentiary hearing reveals possible contamination was not accounted for during initial AAS testing. Mr. Kilty criticized Dr. Rosenberg's testing because the AAS test did not account for possible contamination from the time of the shooting, to the time of arrest, to the time the sample was taken.

In 2009, after Johnson's habeas petition was denied, Petitioner, Johnson, and Wheat filed a motion for new trial in which they presented the same GSR testing flaws asserted in the instant Petition. The court denied the motion and surmised the following:

> All the parties admit that once the AAS testing method is conducted on a sample, that sample is destroyed and cannot be retested for the presence of GSR. As such, Johnson has no newly discovered evidence upon which to request a new trial; he merely has a newly discovered theory upon which he wishes to impeach a prior witness. . . . Science is an ever evolving field, and criminal defendants should not be afforded a new trial every time the scientific testing methods for forensic evidence change.

*State v. Johnson*, 2010 Ohio 4117, No. 93635, 2010 WL 3442282, ¶25 (Ohio Ct. App. 2010).

At best, Petitioner only shows new gunshot residue testing has improved or is more accurate. As Respondent points out, the greater accuracy of current standards does not logically imply that the older standards are unreliable. (Doc. 8-14, Tr. 97-116; Doc. 8-13, Tr. 6-55). Further, Petitioner's experts agreed the particles found on Wheat's hand and Johnson's gloves based on the old test were consistent with GSR. (Doc. 8-14, Tr. 97-116; Doc. 8-13, Tr. 6-55). At Petitioner's hearing on his motion for new trial in 2010, Mr. Nordby agreed that new testing was more precise, but that did not

23

mean AAS was an improper form of testing. (Doc. 8-14, Tr. 75). Mr. Nordby said he had no confidence in Dr. Rosenberg's AAS test, but admitted the chemical test was consistent with gunshot residue and this sort of testing was an accepted scientific test when Dr. Rosenberg performed it. (Doc. 8-14, Tr. 84).

Actual innocence must be based on "new reliable evidence  – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324. However, Petitioner does not have new scientific evidence; indeed, he has no evidence. Petitioner has a theory, but his theory cannot overcome his own expert testimony that particles found on Wheat and Johnson were consistent with GSR based on a scientifically accepted testing procedure when performed. At most, Petitioner's theory evidences impeachment value, which is not enough to present a valid claim of actual innocence. *See Plaza v. Hudson*, 2008 U.S. Dist. LEXIS 102083, at *39 (N.D. Ohio 2008) (impeachment evidence is not sufficient to establish a gateway claim of innocence).

## CONCLUSION AND RECOMMENDATION

Following review, the undersigned recommends the Court find Petitioner is not "actually innocent" according to the standard set forth in *Schlup* and *Souter*. Therefore, Respondent's Motion to Dismiss should be granted and the Petition (Doc. 1) denied and dismissed as time-barred. In accordance with the foregoing recommendation, Petitioner's  remaining motions (Docs. 13, 15, 16, 17) are moot and should be denied.

    s/James R. Knepp II
United States Magistrate Judge

24

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).